Filed 1/22/15  Noval v. Frost CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HECTOR A. NOVAL, | |
| Plaintiff and Appellant, | G048911 |
| v. | (Super. Ct. No. 30-2012-00620923) |
| LOURDES FROST et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment and an order of the Superior Court of Orange County, Sheila Fell, Judge.  Reversed.  Request for judicial notice denied.

Law Offices of Casey T. Young and Casey Young for Plaintiff and Appellant.

Bidna & Keys and Richard D. Keys for Defendant and Respondent Lourdes Frost.

No appearance for Defendants and Respondents Tania Noval and Victor Noval.

*          *          *

Three siblings, Lourdes Frost (Lourdes), Tania Noval (Tania), and Victor Noval (Victor), allegedly directed a hospital to take their father, Victorino Noval (decedent), off life support and administer fatal doses of morphine, without the consent of their brother, Hector Noval (Hector),[1] whose permission was required under a durable power of attorney for healthcare. Lourdes, Tania, and Victor also allegedly absconded with cash and other personal property of decedent while he was hospitalized. A flurry of lawsuits and proceedings followed. In the one generating this appeal, Lourdes filed a demurrer to Hector's complaint on the basis of res judicata, standing, and failure to state facts sufficient to constitute a cause of action. The court, apparently exasperated with the plethora of proceedings, sustained the demurrer without leave to amend, on the basis of the statute of limitations—a ground not raised in the demurrer.

Hector appeals from the judgment of dismissal as to Lourdes following the sustaining of the demurrer. He also appeals from a postjudgment order dismissing the complaint as to defendants who had not been served, which would include Tania and Victor. He argues, inter alia, that the court had no right to raise the statute of limitations sua sponte. We agree. However, "'[w]hen a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action on any theory. [Citations.]'" (*Stueve Bros. Farms, LLC v. Berger Kahn* (2013) 222 Cal.App.4th 303, 309.) Here, we cannot conclude that Hector failed to allege facts sufficient to state a viable cause of action. We reverse.

I

FACTS

*A. Allegations of Complaint:*

In his complaint, Hector alleged the following:

---

[1] We refer to the parties by their first names for ease of reference. We mean no disrespect. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1513, fn. 2.)

Decedent was a fully functioning 78-year-old with about $60 million in assets and $3 million in annual income. On April 28, 2010, decedent was admitted to the hospital with pneumonia. He was intubated and, when sedated, became temporarily incapable of making his own medical decisions. By the end of the 10-day hospitalization, decedent had overcome the pneumonia, had had his intubation removed, had become distress free, and could make "'eye contact for more than 10 seconds.'" Nonetheless, Lourdes, Tania, and Victor ordered hospital staff to terminate decedent's treatment and administer fatal doses of morphine on May 7, 2010, causing his death that day. The only reason the threesome so directed hospital staff was to hasten decedent's death and collect their inheritances.

According to Hector, decedent had a durable power of attorney for health care (health care power) that named Hector and Lourdes as joint attorneys-in-fact, such that the unanimous consent of the two of them was required for action to be taken. However, Lourdes, Tania and Victor falsely represented to hospital staff that Hector concurred in their decision to end decedent's life, and concealed the existence of the health care power from Hector himself. Furthermore, at the same time that they directed hospital staff to withdraw decedent's treatment and end his life, they misrepresented to Hector that decedent's treatment would be continued indefinitely. On May 7, 2010, Lourdes contacted Hector and told him decedent had died of natural causes. She did not mention "any withdrawal of treatment, terminal extubation, or fatal injections of morphine." So, Hector had no reason to suspect foul play.

Hector alleged that he did not learn of the existence of the health care power until February 2011, when it was disclosed during probate proceedings. Health care power in hand, Hector was then able to obtain a copy of decedent's hospital medical records, which disclosed a set of facts entirely different from what he had previously been told. Apparently, Lourdes had told hospital staff that decedent had advanced

Parkinson's disease, had been declining over the preceding six months, had a poor quality of life, would not want to be hooked up to a ventilator, would not want to be resuscitated, and would want to die peacefully. Lourdes, Tania and Victor met with hospital staff on May 4 and 5, 2010 and represented that the whole family, Hector included, "desired terminal extubation for decedent." (Capitalization omitted.) They also represented to hospital staff, on May 5 and 6, 2010, that Hector "was a violent person, a drug addict, someone with paranoid personality," who had "'threatened violence' against them . . . and that they were 'afraid' of him." Hector further alleged that his siblings had represented to hospital staff that he had ulterior motives and was unfit to make health care decisions for decedent.

Lourdes, Tania and Victor met with hospital staff on May 7, 2010 for "the planned withdrawal of decedent's treatment and fatal injections or morphine[.]" (Capitalization omitted.) Even though they were informed that decedent was improving, they declined "the opportunity to . . . cancel decedent's planned death[.]" (Capitalization omitted.) Moreover, they again falsely informed hospital staff that Hector was in favor of the plan, and said he simply elected not to be present. To the contrary, Hector was not even aware of the plan. Hospital staff removed the ventilator, withdrew oxygen support, removed the nutritional tubes, and administered fatal doses of morphine. According to Hector, decedent would have lived absent these acts.

*B. Procedural History:*

Probate proceedings were commenced in the San Bernardino County Superior Court (*Estate of Victorino Noval* (No. PRODS 1000489)) (Probate Proceedings). On August 10, 2010, Lourdes and Tania were appointed executors of the will of decedent.

4

In February 2011, Hector filed, in the Probate Proceedings, a Probate Code section 850 petition for the determination of title to seven pieces of real property. The real properties had been listed on the inventory and appraisal in the Probate Proceedings, but Hector claimed the properties belonged to him.

On about March 14, 2011, Hector filed a complaint against Lourdes, Tania, Victor, and others, in a civil action in the San Bernardino County Superior Court (*Noval v. Noval* (No. CIVVS 1101520)). He filed a first amended complaint two weeks later, asserting causes of action for physical elder abuse, neglect, wrongful death, financial elder abuse, conspiracy, aiding and abetting, fraud, conversion, and breach of fiduciary duty. The lawsuit was transferred to the Orange County Superior Court (*Noval v. Noval* (No. 30-2011-00498440)) (First Lawsuit). At some point, Hector dismissed the First Lawsuit without prejudice.

On April 13, 2011, Hector filed, in the Probate Proceedings, a petition to remove Lourdes and Tania as executors and to appoint himself as successor executor. He alleged, inter alia, that while decedent was still alive in the hospital, they had entered his home, opened his safe, and taken his estate planning documents and other property, including legal and financial documents and $400,000 in cash. He further alleged that they had failed to list the items they took on the inventory and appraisal. Hector maintained that Lourdes and Tania had conflicts of interest, inasmuch as they surely would not enforce the right of decedent's estate to the return of the assets wrongfully taken.

On May 31, 2012, Hector filed another lawsuit, this one against Lourdes and Tania, in the Orange County Superior Court (*Noval v. Frost* (2012, No. 30-2012-00573131)) (Second Lawsuit). This lawsuit asserted many of the same causes of action as the First Lawsuit.

About three weeks later, on June 21, 2012, Hector, on the one hand, and Lourdes and Tania in their capacities as executors of decedent's will and trustees of his trust, on the other hand, signed a settlement agreement with respect to the two petitions Hector had filed in the Probate Proceedings. Among other things, Lourdes and Tania agreed to distribute the seven properties in question to Hector as part of his distributive share of decedent's trust estate. In exchange, Hector agreed to dismiss the Probate Code section 850 petition and the removal petition.

On August 7, 2012, Hector filed a first amended complaint in the Second Lawsuit. Thereafter, Lourdes filed a demurrer, primarily based on lack of standing. Lourdes raised a statute of limitations defense with respect to one of the 12 causes of action—the one pertaining to physical elder abuse under Welfare and Institutions Code section 15610.63.

Although we find nothing in the record on the point, according to Attorney Casey Young, counsel for Hector, in December 2012, the court sustained the demurrers in part, overruled them in part, and granted Hector leave to amend. Lourdes represents that "the primary ground upon which the Court . . . sustained the demurrer" was standing. Further according to Attorney Young, after filing a second amended complaint, he realized that he had added new parties and new causes of action without first obtaining leave of the court. Because of this procedural error, he dismissed the Second Lawsuit without prejudice and refiled the matter as a new complaint.

The record reflects that, on December 28, 2012, Hector filed, in the Orange County Superior Court, the underlying action for physical elder abuse, neglect, financial elder abuse, wrongful death, and conspiracy, against Lourdes, Tania, and Victor (*Noval. v. Frost* (2013, No. 30-2012-00620923)) (Third Lawsuit). In February 2013, Lourdes filed a demurrer to the complaint, on the basis of res judicata, standing, and failure to state facts sufficient to constitute a cause of action.

6

The court sustained the demurrer on the basis of the statute of limitations, and entered a judgment of dismissal as to Lourdes. [2]  Hector appeals.

II

DISCUSSION

A.  *Standard of Review:*

"We independently review the ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action.  [Citation.]  We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and matters of which judicial notice has been taken.  [Citation.]  We construe the pleading in a reasonable manner and read the allegations in context.  [Citation.]  We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons.  [Citation.]" (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111.)

B.  *Statute of Limitations:*

*(1)  Hearing—*

Although the grounds raised in the demurrer were res judicata, standing, and the failure to state facts sufficient to constitute a cause of action, Hector is correct that the court, sua sponte, ruled on the basis of the statute of limitations.  At the hearing on the demurrer, immediately after the lawyers announced their appearances, the court stated:  "From what I can see the statute of limitations has run on the whole case.  I'm

---

[2]  It would appear that legal battles between the parties have not been limited to the three above-referenced lawsuits and the Probate Proceedings.  The record on appeal indicates that there has been at least one other matter, entitled *In re Victorino Noval Revocable Trust* (Super. Ct. Orange County, No. 30-2011-00457465), commenced sometime prior to March 15, 2012 (on which date a deposition was taken).  Furthermore, Lourdes represents, without citation to the record, that Hector filed a petition in the Los Angeles County Superior Court to obtain an order to disinter decedent's remains, a request that purportedly had already been rejected by the Orange County Superior Court.

going to sustain the demurrer without leave." Attorney Young replied that the statute of limitations was not an issue raised in the demurrer. The court responded: "The statute has run. There's no point to go on."

Attorney Young began to address tolling and the court quickly interrupted with: "What you've shown me does not toll the statute." Attorney Young requested leave to amend to plead more specific facts with respect to tolling. The court replied: "I think you've done it a few times in a similar lawsuit in several courts, including this one. I'm not going to give you leave to amend unless there's a reason to do so."

Attorney Young continued to assert that the statute of limitations was not at issue and that he had had no opportunity to brief the matter. The court said: "Well, yeah, you did. You talked about the power of attorney and how this would toll the statute. It doesn't." However, the court would not entertain discussion on the point.

We note that while the demurrer to the first amended complaint in the Second Lawsuit raised the issue of the statute of limitations with respect to one cause of action, for physical elder abuse, the demurrer to the complaint in the Third Lawsuit did not raise the statute of limitations at all. Nonetheless, apparently out of an abundance of caution, Hector, in his complaint in the Third Lawsuit, indicated that he had no reason to suspect wrongdoing before February 2011. That was when he found out that he had been named in the health care power as one of decedent's joint attorneys-in-fact—a matter Lourdes, Tania, and Victor had concealed from him. Thereafter, in March 2011, he used the health care power to obtain decedent's medical records, which demonstrated that decedent had died not of natural causes, as Lourdes had represented, but rather of what Hector called "planned euthanization." However, Hector's discussion pertained only to the facts of discovery, and did not address either legal authorities on the discovery rule, or the lengths of the statutes of limitations applicable to the five causes of action.

8

*(2) Analysis—*

As Hector duly observes, a complaint does not fail to state a cause of action just because a cause of action may be barred by the statute of limitations. Rather, the defense of the statute of limitations is personal to the defendant and if the defendant does not raise the defense in his or her demurrer, the defense is waived. (*Bank of America etc. Assn. v. Ames* (1936) 18 Cal.App.2d 311; see also *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 940, fn. 4.) It follows that it was not the place of the trial court to raise the defense on Lourdes's behalf, thereby denying Hector the opportunity to present his argument on the matter. (Cf. *Day v. McDonough* (2006) 547 U.S. 198 [court sua sponte raised timeliness of habeas corpus]; *McMillan v. Jarvis* (4th Cir. 2003) 332 F.3d 244 [same].)

Lourdes does not respond to these points or these authorities. Rather, she focuses her attention on the arguments raised in the demurrer, and reminds us that the appellate court must affirm the ruling sustaining a demurrer without leave to amend if any of the grounds stated in the demurrer is correct. (*Fremont Indemnity Co. v. Fremont General Corp.*, *supra*, 148 Cal.App.4th at p. 111.) However, she does mention the statute of limitations with respect to only one of the causes of action—the physical elder abuse cause of action. She now mentions that the statute of limitations is two years (Code Civ. Proc., § 335.1) and contends there should be no tolling, because the facts as she presents them do not support the assertion that Hector was unaware that he was one of decedent's attorneys-in-fact under the health care power.

However, even if we were to consider the statute of limitations, we would assume the facts as alleged in the complaint, not as proffered by a defendant, are true for the purposes of the demurrer. (*Stueve Bros. Farms, LLC v. Berger Kahn*, *supra*, 222 Cal.App.4th at pp. 309-310.) Moreover, "'"[t]he question of when there has been a belated discovery of the cause of action, . . . is essentially a *question of fact* . . . [and] [i]t

9

is only where reasonable minds can draw but one conclusion from the evidence that the question becomes a matter of law.' [Citations.]" [Citations.]'" (*Id.* at p. 315.) Consequently, "''"'a demurrer on the ground of the bar of the statute of limitations does not lie where the complaint merely shows that the action may have been barred. It must appear affirmatively that, upon the facts stated, the right of action is necessarily barred.' [Citations.]" [Citations.]' [Citation.]" (*Id.* at p. 313.) So, had the demurrer raised the issue of the tolling of the statute of limitations as Lourdes now discusses, it still would have been error to sustain the demurrer without leave to amend.

But the point of the matter is that the demurrer to the complaint in the Third Lawsuit did not raise the statute of limitations. Even were we to go back in time and consider the demurrer to the first amended complaint in the Second Lawsuit, we would see that it mentioned the statute of limitations with respect to only the physical elder abuse cause of action and none of the others. There is no basis for even conjuring up a historical challenge to the other four causes of action raised in the Third Lawsuit.

We agree with Hector. It was improper for the court to raise the issue of the statute of limitations sua sponte and to dismiss all of Hector's causes of action without permitting him leave to amend. Moreover, the ruling was doubly problematic in light of Welfare and Institutions Code section 15657.7, which provides a four-year statute of limitations for financial elder abuse. Lourdes does not explain how it is that the entirety of the lawsuit could possibly be barred in light of that statute.

We turn, then, to the grounds that were actually raised in Lourdes's demurrer.

## C. *Res Judicata:*

On June 21, 2012, Lourdes and Tania, in their capacities as executors of decedent's estate and trustees of decedent's trust, entered into a settlement agreement

10

with Hector in the Probate Proceedings.  The agreement settled Hector's claims under his Probate Code section 850 petition regarding title to seven identified real properties and his petition to remove Lourdes and Tania as executors of decedent's will.

The settlement agreement provided that, upon court approval thereof, the seven properties would be transferred to Hector, as preliminary distributions from his share of decedent's trust estate, and his two petitions would be dismissed with prejudice. Thereupon, Lourdes and Tania, as executors of decedent's estate and trustees of decedent's trust, on the one hand, and Hector, on the other, would release their respective claims relating to the properties, the Probate Code section 850 petition, and the removal petition.

Of particular importance to the matter before us, paragraph 6 of the settlement agreement stated in pertinent part:  "[T]he releases by Hector shall enure to the benefit of Lourdes Frost and Tania Noval, individually, as well as all beneficiaries of the Trust.  *Such releases shall not affect and/or release any claims or allegations unrelated to the Properties made in the ongoing litigation relating to the Trust and/or any alleged liability for the death of [decedent].*"  (Italics added.)

As Lourdes stated in her demurrer, Hector's petition for removal had attached thereto a copy of the March 28, 2011 first amended complaint filed in the Second Lawsuit.  Lourdes further stated:  "*The petition and attached civil complaint alleged the same basic facts and made the same allegations of 'wrongdoing' as the instant action . . . ,*" including that Lourdes and Tania concealed the health care power from Hector, wrongfully directed hospital staff to remove decedent from life support, and removed cash and other property from decedent's home.  (Italics added.)

In her demurrer, Lourdes also said that the court had dismissed Hector's removal petition with prejudice, in accordance with the terms of the settlement agreement.  Citing *Estate of Redfield* (2011) 193 Cal.App.4th 1526, she claimed that

because the removal petition had been dismissed with prejudice, all of the claims raised in the Second Lawsuit were barred by the doctrine of res judicata and could not be raised again in the Third Lawsuit. She maintains this position on appeal.

Her citation to *Estate of Redfield*, *supra*, 193 Cal.App.4th 1526 is unavailing. In *Redfield*, several siblings got into a dispute over whether their mother's will was valid and whether $136,000 one sibling had withdrawn from their mother's bank account shortly before her death should be included in her estate. Two siblings filed will contests, as well as Probate Code section 850 petitions in which they requested the court to determine that the $136,000 was part of the mother's estate. (*Id.* at pp. 1528-1530.)

Ultimately, the siblings settled both the will contests and the petitions for determination of title to the $136,000. They sought court approval of the settlement, which included an agreement that the decedent's estate would be divided in equal shares per intestate succession, and the dismissal with prejudice of the petition for probate of the will. Furthermore, the will contests and the petitions for determination of title were withdrawn. One sibling nonetheless objected to the settlement, on the ground that the $136,000 was not an inter vivos gift, and should be included in the estate. Decedent's granddaughter, who previously had been appointed co-administrator of the estate, filed a petition for instructions, seeking clarification of the settlement, and arguing that it was ambiguous as to whether the $136,000 was to be included in the estate or not. (*Estate of Redfield*, *supra*, 193 Cal.App.4th at pp. 1530-1531.)

The court heard argument on both the petition for approval of the settlement and the petition for instructions. It denied the petition for instructions, approved the settlement, denied the petition to probate the will, and dismissed with prejudice the will contests and the petitions for determination of title as to the $136,000. It entered an order accordingly and no appeal was taken. (*Estate of Redfield*, *supra*, 193 Cal.App.4th at p. 1531.) More than a year and a half later, two of the settling siblings

12

objected to an accounting filed in the proceedings, on the basis that it failed to include the $136,000 as part of the estate. The court held a trial on the matter and ultimately determined that the $136,000 was part of the estate after all. (*Id.* at pp. 1532-1533.) The determination was reversed on appeal, on the basis of res judicata. (*Id.* at pp. 1533-1537.)

As the appellate court in *Estate of Redfield*, *supra*, 193 Cal.App.4th 1526 observed: "'Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties . . . .'" (*Id.* at p. 1534.) It further stated: "Application of the doctrine of res judicata requires an affirmative answer to the following three questions: (1) Was there a final judgment on the merits? (2) Was the issue decided in the prior adjudication identical with the one presented in the subsequent litigation? (3) Was the party against whom the principle is involved a party . . . to the prior adjudication? [Citation.]" (*Ibid.*) The appellate court in *Redfield* answered all three questions in the affirmative, on the facts before it. (*Ibid.*)

Of particular importance in the matter before us, the appellate court in *Estate of Redfield*, *supra*, 193 Cal.App.4th 1526 observed that the issue adjudicated by the probate court on the petitions for determination of title was identical to the one raised in the later challenge to the accounting—whether the $136,000 was or was not part of the estate. The appellate court observed that the probate court's approval of the settlement and dismissal of the petitions for determination of title constituted a final judgment on the merits to the effect that the $136,000 was not included in the estate. (*Id.* at p. 1535.)

*Estate of Redfield*, *supra*, 193 Cal.App.4th 1526 is distinguishable from the case before us. The settlement agreement between Hector, Lourdes and Tania provided that Hector's removal petition would be withdrawn. In other words, he agreed to stop seeking a determination that Lourdes and Tania should not be executors. The settlement agreement did not include a provision that the Second Lawsuit would also be dismissed

13

with prejudice.  Just because Hector attached to his removal petition a copy of the first amended complaint in the Second Lawsuit, to show why he felt Lourdes and Tania should not be executors, did not mean that when he withdrew his request that they be removed as executors he was abandoning his monetary claims against them.  To the contrary, paragraph 6 of the settlement agreement specifically stated:  "Such releases shall not affect and/or release any claims or allegations unrelated to the Properties made in the ongoing litigation relating to the Trust and/or any alleged liability for the death of [decedent]."  In other words, he preserved that claim.

In contrast, there is no indication that, in *Estate of Redfield*, *supra*, 193 Cal.App.4th 1526, there was an explicit agreement to preserve certain claims for later resolution.  Moreover, in *Estate of Redfield,* unlike the case before us, there was a dispute as to the terms of the settlement itself that was resolved by probate court order more than one and a half years before the matter was dredged up again in the same probate proceedings.  In the case before us, however, the probate court did not adjudicate the merits of the Second Lawsuit and make a determination whether Lourdes, Tania and Victor owed monetary damages to Hector.

Given this, in the matter before us we must answer the second of the three questions bearing upon res judicata in the negative.  There was no identity of issues between the Probate Proceedings and the Third Lawsuit.  That is, the court in the Probate Proceedings decided whether the settlement, including the agreement to dismiss with prejudice the removal petition, should be approved.  The dismissal of the removal petition, with prejudice, barred any subsequent claim that Lourdes and Tania should be removed as executors based on the grounds stated therein, including the grounds alleged in the first amended complaint in the Second Lawsuit.  It did not bar a claim for damages on the ground that Lourdes and Tania had acted wrongfully, as described in that lawsuit.  This is especially so when the court's approval of the settlement agreement necessarily

14

constituted an approval of the paragraph 6 provision to the effect that the claim was preserved.

Lourdes's citation to *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788 does not convince us otherwise. As the court in that case observed: "To determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have 'consistently applied the "primary rights" theory.' [Citation.]" (*Id.* at p. 797.) "'In California the phrase "cause of action" is often used indiscriminately . . . to mean *counts* which state [according to different legal theories] the same cause of action. . . .' [Citation.] But for purposes of applying the doctrine of res judicata, the phrase 'cause of action' has a more precise meaning: The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced. [Citation.]" (*Id.* at p. 798.)

The court in *Boeken v. Philip Morris USA, Inc.*, *supra*, 48 Cal.4th 788, addressed whether a wife who, during her husband's lifetime had both filed, and dismissed with prejudice, a loss of consortium lawsuit against the defendant cigarette manufacturer, could later bring a wrongful death lawsuit against the same defendant. (*Id.* at pp. 791-792.) With respect to the loss of consortium action, the court concluded that the primary right at issue "was the right not to be wrongfully deprived of spousal companionship and affection, and the corresponding duty was the duty not to wrongfully deprive a person of spousal companionship and affection. The breach was the conduct of defendant . . . that wrongfully induced plaintiff's husband to smoke defendant's cigarettes." (*Id.* at p. 798, italics omitted.) The court held that once the plaintiff had dismissed with prejudice her original lawsuit for loss of consortium, she "could not later allege the same breach of duty in a second lawsuit against defendant, based on a new legal theory (statutory wrongful death)." (*Ibid.*) The court further explained: "[T]he two actions concern the same plaintiff seeking the same damages from the same defendant for

15

the same harm, and to that extent they involve the same primary right." (*Id.* at p. 804.)

Lourdes says *Boeken v. Philip Morris USA, Inc.*, *supra*, 48 Cal.4th 788 shows that the same primary rights—the alleged wrongful killing of decedent and the alleged wrongful taking of his property—were at issue in both the removal petition in the Probate Proceedings and in the Third Lawsuit. We disagree. The primary rights at issue in the Third Lawsuit were the rights of decedent not to suffer his wrongful death at the hands of defendants and not to suffer the wrongful taking of his property by defendants. The primary right at issue in the removal petition in the Probate Proceedings was the right of a party interested in the estate of decedent to have the estate administered by executors who were free from conflicts of interest and who would properly sequester, inventory, and distribute all assets of the decedent passing under his will.

Even if we were to agree with Lourdes's characterization of the primary rights at issue, we would note that *Boeken v. Philip Morris USA, Inc.*, *supra*, 48 Cal.4th 788 is distinguishable from the matter before us and does not control its outcome. *Boeken* did not involve a settlement agreement wherein the parties specifically excepted certain matters from the settlement and preserved them for later resolution. Although Lourdes maintains that paragraph 6 of the settlement agreement did not carve out an exception, it clearly did. The settlement agreement, by its terms, did not serve to "release any claims or allegations unrelated to the Properties made in the ongoing litigation relating to the Trust and/or any alleged liability for the death of [decedent]." Consequently, the dismissal with prejudice of the removal petition, in effectuation of the settlement agreement, did not operate as a final judgment as to those claims and the doctrine of res judicata does not bar them.

16

*D. Standing:*

Hector alleged physical elder abuse (Welf. & Inst. Code, § 15610.63), neglect (Welf. & Inst. Code, § 15610.57), and financial elder abuse (Welf. & Inst. Code, § 15610.30), in his first, second and third causes of action, respectively. In his fifth cause of action, he alleged conspiracy to commit physical elder abuse, neglect and wrongful death. In her demurrer, Lourdes asserted that Hector lacked standing to assert each of these causes of action.[3]

Lourdes argued that these causes of action were each based on duties she allegedly owed to decedent, not to Hector, so he had no standing to sue on them. She also cited Code of Civil Procedure section 377.30, which provides: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest, subject to Chapter 1 (commencing with Section 7000) of Part 1 of Division 7 of the Probate Code, and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." Lourdes said that, inasmuch as she had been appointed decedent's personal representative, it was she, not Hector, who had the right to pursue any cause of action that survived decedent's death.

In addition, Lourdes stated that Welfare and Institutions Code section 15657 et seq. provided no different result.[4] Hector maintains that Welfare and

---

[3] Lourdes did not appear to argue that Hector lacked standing to bring the fourth cause of action, for wrongful death.

[4] She commented that Hector should be well familiar with the issue inasmuch as the primary reason the court had sustained the demurrer to Hector's first amended complaint in the Second Lawsuit was Hector's lack of standing. Interestingly, Lourdes also stated, in her reply to Hector's opposition: "The complaint simply fails to allege the basis upon which Hector asserts he has standing to bring a claim for 'elder abuse.' While that defect *can possibly be cured by amendment*, it does not change the fact that the complaint, as pleaded, is defective." (Italics added.)

17

Institutions Code section 15657.3, subdivision (d)(2) does indeed confer standing upon him. We agree.

Welfare and Institutions Code section 15657.3, subdivision (d)(1) provides: "Subject to paragraph (2) . . . , after the death of the elder or dependent adult, the right to commence or maintain an action shall pass to the personal representative of the decedent. . . ." However, paragraph (2) states: "If the personal representative refuses to commence or maintain an action or if the personal representative's family or an affiliate, . . . is alleged to have committed abuse of the elder or dependent adult, the persons described in subparagraphs (A), (B), and (C) of paragraph (1) shall have standing to commence or maintain an action for elder abuse. . . ." (Welf. & Inst. Code, § 15657.3, subd. (d)(2).) Hector is a person described in subparagraph (C) of paragraph (1), inasmuch as he is an "interested person" as defined in Probate Code section 48.[5] Furthermore, Lourdes, as the personal representative, refuses to commence an action, against herself, Tania and Victor, and she and those siblings are alleged to have committed the elder abuse in question. So, Hector is correct that, under Welfare and Institutions Code section 15657.3, subdivision (d)(2), he has standing to pursue the causes of action in question.

The point of the matter is that when the person who allegedly wronged the decedent is the one with standing to commence litigation to right the wrong, but obviously will never undertake to do so, it cannot be the case that the wrongdoer gets away with the wrongful act simply because no one has standing to pursue him or her. (Cf. *Stueve Bros. Farms, LLC v. Berger Kahn*, *supra*, 222 Cal.App.4th at p. 316; *Estate of Lowrie* (2004) 118 Cal.App.4th 220, 231.) In other words, it is untenable to assert that

_____

[5]       Probate Code section 48, subdivision (a)(1), defines an "interested person" as "[a]n heir, devisee, child, . . . beneficiary, and any other person having a property right in . . . a trust estate or the estate of a decedent . . . ." We understand Hector to be both the child of the decedent and a beneficiary of his trust.

one who allegedly wrongfully took money and other property from a decedent before his death, thereby removing the same from the decedent's estate in which other persons were entitled to share, could not be challenged in court because he or she had fortuitously been named as personal representative in the decedent's estate plan. The same holds true for someone who committed the unlawful killing of a decedent with malice aforethought, as Hector alleges in his complaint. Rather, "where a [personal representative] cannot or will not enforce a valid cause of action that [he or she] ought to bring . . . , a . . . beneficiary may seek judicial compulsion against the [personal representative]." (*Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419, 427 [trust context]; see also *King v. Johnston* (2009) 178 Cal.App.4th 1488, 1500-1502; *Harnedy v. Whitty* (2003) 110 Cal.App.4th 1333, 1339-1342; cf. Prob. Code, § 16420; *Estate of Bowles* (2008) 169 Cal.App.4th 684, 692-694.)


E.  *Failure to State a Cause of Action:*

> *(1) Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst.*
> *Code, § 15600 et seq.) (the Elder Abuse Act)—*

Finally, in her demurrer, Lourdes challenged each cause of action for failure to state facts constituting a cause of action. Hector contends the allegations of the complaint satisfied the requirements of the Elder Abuse Act.

Lourdes responds that it is unclear whether the provisions of the Elder Abuse Act were even intended to give rise to independent cause of actions, citing *ARA Living Centers - Pacific, Inc. v. Superior Court* (1993) 18 Cal.App.4th 1556 and *Berkley v. Dowds* (2007) 152 Cal.App.4th 518. These are not the most persuasive authorities, however. The court in *ARA Living Centers* addressed an issue not present in the case before us, regarding the retroactivity of Welfare and Institutions Code section 15657. (*ARA Living Centers - Pacific, Inc. v. Superior Court*, *supra*, 18 Cal.App.4th at pp. 1558,

19

1560-1562.)  In so doing, the court remarked that, inasmuch as "elder abuse" had been defined by statute nearly a decade before the enactment of section 15657, the section "did not add a cause of action."  (*ARA Living Centers - Pacific, Inc. v. Superior Court*, *supra*, 18 Cal.App.4th at pp. 1560, 1563.)  The court in *Berkley v. Dowds*, *supra*, 152 Cal.App.4th 518 held that a demurrer to a cross-complaint was properly sustained without leave to amend, where the cross-complaint failed to allege facts satisfying the requirements of the applicable provisions of the Elder Abuse Act.  (*Id.* at pp. 521-522, 529-530.)  The *Berkley* court, citing *ARA Living Centers* without analysis, commented in its introductory remarks that the Elder Abuse "Act does not create a cause of action as such, but provides for attorney fees, costs, and punitive damages under certain conditions.  [Citations.]"  (*Berkley v. Dowds*, *supra*, 152 Cal.App.4th at p. 529.)

We conclude the better view is expressed in *Perlin v. Fountain View Management, Inc.* (2008) 163 Cal.App.4th 657, in which the court directly addressed the question whether the Elder Abuse Act creates a cause of action.  (*Id.* at pp. 664-666.)  After considering certain Supreme Court authorities, the *Perlin* court stated plainly that the Elder Abuse "Act creates an independent cause of action.  [Citations.]"  (*Perlin v. Fountain View Management, Inc.*, *supra*, 163 Cal.App.4th at p. 666.)

True, *Perlin v. Fountain View Management, Inc.*, *supra*, 163 Cal.App.4th 657, relied on dicta from a various authorities.  Indeed, numerous Elder Abuse Act cases have arisen in the context where the parties apparently assumed that the statutes created a cause of action and the reviewing courts addressed not that point, but other Elder Abuse Act issues as framed by the parties.  (See, e.g., *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771; *Delaney v. Baker* (1999) 20 Cal.4th 23; *Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72; *Mack v. Soung* (2000) 80 Cal.App.4th 966.)

For example, the court in *Delaney v. Baker*, *supra*, 20 Cal.4th 23 made reference to a Welfare and Institutions Code section 15657 cause of action for "statutory

20

abuse or neglect committed with recklessness, oppression, fraud or malice." (*Id.* at p. 41.) It noted that the statute provided for attorney fees and pain and suffering damages for "reckless neglect." (*Ibid.*) The court in *Covenant Care, Inc. v. Superior Court*, *supra*, 32 Cal.4th 771 similarly made mention of what it called "statutory causes of action for elder abuse committed with recklessness, oppression, fraud, or malice (Welf. & Inst. Code, § 15657)." (*Covenant Care, Inc. v. Superior Court*, *supra*, 32 Cal.4th at p. 786.) It further noted "that statutory elder abuse includes 'neglect as defined in Section 15610.57' [citation] . . . ." (*Covenant Care, Inc. v. Superior Court*, *supra*, 32 Cal.4th at p. 783.) Likewise, the court in *Intrieri v. Superior Court*, *supra*, 117 Cal.App.4th 72 stated "[t]he elements of a cause of action under the Elder Abuse Act are statutory . . . . [Citation.]" (*Id.* at p. 82.)

Dicta aside, we observe that the language of several statutes supports the view that a complaint framing allegations satisfying the requirements of the Elder Abuse Act states a cause of action thereunder. As noted previously, Welfare and Institutions Code section 15657.3, subdivision (d)(1) provides that "after the death of the elder or dependent adult, *the right to commence . . . an action* shall pass to the personal representative of the decedent. . . ." (Italics added.) Furthermore, Welfare and Institutions Code section 15657.7 provides: "An *action for damages pursuant to Sections 15657.5 and 15657.6 for financial abuse of an elder or dependent adult . . . ,* shall be commenced within four years after the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." (Italics added.) Welfare and Institutions Code section 15657.5, subdivisions (a), (b), (c), and (e) pertain to claims for and liability for "financial abuse . . . *as defined in Section 15610.30.*" (Italics added.) Finally, Welfare and Institutions Code section 15600, subdivision (j) provides: "It is the . . . intent of the Legislature in adding Article 8.5 (commencing with Section 15657) to this chapter to enable interested persons to

21

engage attorneys to *take up the cause* of abused elderly persons and dependent adults."
(Italics added.)

In short, we agree with the court in *Perlin v. Fountain View Management, Inc.*, *supra*, 163 Cal.App.4th 657, that where a complaint makes allegations satisfying the requirements of the Elder Abuse Act, it states a cause of action. (*Perlin v. Fountain View Management, Inc.*, *supra*, 163 Cal.App.4th at p. 666.) We turn, then to Hector's assertion that his complaint did indeed make such allegations.

*(2) Physical elder abuse—*

Welfare and Institutions Code section 15610.63 defines "physical abuse" as: (a) assault (Pen. Code, § 240); (b) battery (Pen. Code, § 242); (c) assault with a deadly weapon (Pen. Code, § 245); (d) "[u]nreasonable physical constraint, or prolonged or continual deprivation of food or water[;]" (e) sexual assault; or (f) "[u]se of a physical or chemical restraint or psychotropic medication" under specified circumstances.

As Hector observes, when a doctor performs a procedure without patient consent, he commits a battery. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324-325.) Hector argues that when Lourdes, without his consent under the health care power, directed "hospital staff to remove [decedent] from the ventilator, eliminate his oxygen support, remove his nutritional tubes, and administer fatal dosages of morphine," she directed acts that constituted a battery. He cites Probate Code section 4202, subdivision (b), which provides: "Authority granted to two or more attorneys-in-fact is exercisable only by their unanimous action." Hector argues that because he was a joint attorney-in-fact and did not give his consent to the administration of fatal doses of morphine, the drug was administered without consent and thus, a battery was committed against decedent. He states that, under *Ayer v. Robinson* (1958) 163 Cal.App.2d 424, 428, Lourdes was liable for the battery, having directed it to take place. (See also *People v. Beeman* (1984) 35 Cal.3d 547.)

22

Lourdes counters that decedent, in effect, gave his own consent, inasmuch as his health care power directed medical personnel to withdraw life support under the circumstances. Indeed, his declaration attached to the health care power states: "*If I should have an incurable and irreversible condition that has been diagnosed by two physicians* and that will result in my death within a relatively short time without the administration of life-sustaining treatment . . . , and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician, . . . to withhold or withdraw treatment, including artificially administered nutrition and hydration, that only prolongs the process of dying . . . and is not necessary for my comfort or to alleviate pain." (Italics added.)

However, the complaint alleges that decedent did not have an incurable and irreversible condition. Rather, it alleges that decedent had "overcome his pneumonia," showed no signs of infection, and had improved so substantially that hospital staff asked whether the family wanted to change course and cancel the instruction to remove intubation and administer fatal doses of morphine. In short, factual issues concerning consent abound. Consequently, "[i]t is premature to determine the point on appeal[.]" (*Stueve Bros. Farms, LLC v. Berger Kahn*, *supra*, 222 Cal.App.4th at p. 325.)

*(3) Neglect—*

The Welfare and Institutions Code section 15610.57 definition of "neglect" includes, in subdivision (a)(1), "The negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." In her demurrer, Lourdes asserted that the allegations of the complaint showed that decedent was in the care and custody of the hospital, not her, and therefore the requirements of the statute were not met. She also stated that the complaint did not allege that she failed "to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. & Inst. Code, § 15610.57,

23

subd. (a)(1).)  Finally, relying on *Delaney v. Baker*, *supra*, 20 Cal.4th 23, Lourdes said the complaint was required to allege that she acted with recklessness, oppression, fraud, or malice, in order to state a cause of action under Welfare and Institutions Code section 15657 et seq., but that it failed to do so.  She renews these arguments on appeal.

While the complaint recited that decedent was hospitalized at the time of his death, it alleged that Lourdes utilized a health care power to direct hospital staff with regard to his care and treatment.  It further alleged that Lourdes failed "to exercise that degree of care which a reasonable person in a like position would have exercised."  It continued on to state that she "acted recklessly, intentionally, oppressively, fraudulently, and maliciously . . . with the sole intent of willfully and unlawfully killing [decedent] with malice aforethought."  It explained that she directed hospital staff to withdraw ventilation and nutrition and to administer fatal doses of morphine even though decedent had "overcome his pneumonia" and improved substantially, so substantially that on May 7, 2010, hospital staff pointed out that decedent was better even than the day before and indicated that perhaps Lourdes would want to wait before making a decision to remove intubation and administer the morphine.  The complaint also alleged that hospital staff had asked Lourdes about whether Hector, who was joint attorney-in-fact under the health care power, agreed with her desired course of action and that Lourdes, on more than one day, including May 7, 2010, misrepresented that he agreed to the termination of decedent's life.

Lourdes insists that members of the hospital staff were "*acting within the scope of their own medical judgment*" and would not have terminated life support if it had not been appropriate to do so.  However, the point of the lawsuit is that the members of the hospital staff did not choose to terminate decedent's life on their own, but rather, that Lourdes, armed with the health care power and providing a false representation that Hector agreed, directed them to do so.  Moreover, while one might assume, and indeed

24

hope, that hospital staff would not take the action in question were it not appropriate to do so, this is not an assumption we make for the purposes of a demurrer. We do not prejudge the likelihood that a plaintiff will be able to prove the facts alleged. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496; *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239.)

Lourdes warns the court, with respect to both the cause of action for physical elder abuse and the cause of action for neglect, that the court would proceed down a very slippery slope if it held that a grief stricken family could be subject to civil liability for following the recommendation of medical personnel to withdraw life support. But the allegations here are more than that. The allegations are that defendants knowingly, and indeed fraudulently, excluded Hector from exercising his right as attorney-in-fact to advocate for the preservation of decedent's life, and further, that they did so in order to pursue their own self interests and seize decedent's fortune. Finally, Hector alleges that defendants took these actions in a context where hospital staff indicated that decedent had improved substantially and perhaps the family should reconsider the plan to terminate life support.

*(4) Financial elder abuse—*

Welfare and Institutions Code section 15610.30, subdivision (a)(1), (2) provides that financial abuse occurs when one either takes, or assists another "in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."

In his complaint, Hector alleged that, while decedent was in the hospital, Lourdes, Tania and Victor entered decedent's home and took certain of his property, including, among other things, real estate documents, estate planning documents, financial documents, checkbooks, guns, and cash-on-hand. He stated that the items wrongfully taken included a $5,000 check, and that they transferred title to decedent's

25

Mercedes Benz to their mother. In addition, Hector alleged that, in 2008, Lourdes engaged in a scheme whereby she purchased a piece of San Juan Capistrano real estate from decedent for $14.5 million, but managed to secretly take back $2 million of the purchase price without decedent's consent. He further alleged that, after decedent found out, he demanded the return of the money, which remained owing at the time of his death. Purportedly, the paperwork documenting this course of events was among the documentation defendants stole. That being the case, upon decedent's death, Lourdes would get away with keeping the money.

In her demurrer, Lourdes argued the complaint did not allege that anything she did caused decedent harm. Rather, she asserted the complaint merely stated that she took possession of certain records and personal items. She further stated that the allegations that she "'took back' $2 million of the purchase price she paid for" the San Juan Capistrano property made no sense. She reiterates these arguments on appeal, and further asserts that the statute of limitations on the purported wrongful taking of $2 million in 2008 had to have run by the time the complaint was filed on December 28, 2012.

We do not read Welfare and Institutions Code section 15610.30, subdivision (a) as requiring the plaintiff to specify the exact harm the elder or dependent adult suffered as a result of the wrongful taking. Furthermore, it is understandable that Hector was unable to detail the specific mechanism whereby Lourdes allegedly absconded with decedent's $2 million, inasmuch as defendants allegedly stole the paperwork documenting the transaction and the debt. Furthermore, a wrongful taking in 2008 would not necessarily be barred by December 28, 2012. Welfare and Institutions Code section 15657.7 provides a four-year statute of limitations from the date "the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." In any event, to the extent the

26

allegations of the financial elder abuse cause of action were vague, Hector should have been given an opportunity to amend his complaint.

*(5)  Wrongful death—*

In her demurrer, Lourdes stated in a quick two sentences simply that Hector's cause of action for wrongful death failed for the same reasons that his other causes of action failed.  In her respondent's brief on appeal, she provides an equally curt discussion, in which she states that "consenting to [decedent] being removed from life support is not a wrongful act."  But it could be on the facts alleged.  Moreover, the facts alleged are that Lourdes did something other than just consent to a course of conduct desired by hospital staff.

*(6)  Conspiracy—*

In his conspiracy cause of action, Hector alleged that defendants conspired to commit wrongful death, physical elder abuse, and neglect.  In her demurrer, Lourdes correctly pointed out that conspiracy is not a separate tort.  "'Although conspiracy to commit a tort is not a separate cause of action from the tort itself, alleging a conspiracy fastens liability on those who agree to the plan to commit the wrong as well as those who actually carry it out.  [Citation.]'" (*Stueve Bros. Farms, LLC v. Berger Kahn*, *supra*, 222 Cal.App.4th at p. 323.)  While the court could properly sustain a demurrer as to this particular cause of action, Hector should be given leave to amend as and if necessary to weave the conspiracy allegations into his other causes of action.

*F.  Request for Judicial Notice:*

As a final note, Hector has filed a request for judicial notice, in which he asks this court to take notice of a portion of the transcript of a deposition taken in another case.  The request does not comply with the requirements of California Rules of Court,

27

rule 8.252(a).[6]  The request is denied.  (See *Kinney v. Overton* (2007) 153 Cal.App.4th 482, 497, fn. 7.)

III

DISPOSITION

Appellant's request for judicial notice is denied.  The judgment and the postjudgment order are reversed.  Appellant shall recover his costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.

---

[6]  As an aside, we observe that Hector is not the only one who has failed to comply with the California Rules of Court in this appeal.  Lourdes's respondent's brief is largely devoid of record references to support her factual assertions.  Fully aware of this, Lourdes acknowledges that her description of the background facts and procedural history is not supported by record references.  However, she says her proffered facts are simply provided to show the context in which the appeal arises.  We admonish counsel for failing to comply with California Rules of Court, rule 8.204(a)(1)(C) and we disregard any assertion of fact not supported by the record.  (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 611-612.)

28